Good morning, Your Honors. May it please the Court, my name is Mark Ebert and I represent Mr. Robert Barroca. Subject to how many questions the Court has, of course, I'd like to reserve half my time for rebuttal. And I will be somewhat brief in my prepared remarks because, as you know, the briefing was extremely complete and I'm kind of anticipating more than one or two questions from the panel. So what I'm going to focus on is the one of the core issues, which is the protective sweep or look-see, as the police described it, on the tapes and the effect that the information on those tapes would have on the validity of that warrantless search. Okay. Now, I don't want to rearrange or totally control the order of your argument, but I will simply signal to you that if you're going to lose my vote in this case, you're going to lose it based on the warrant that comes out of the Alameda County judge. Okay. All right. Well, then maybe I will rearrange my argument. The Alameda County warrant was inadequate to support this search for a number of reasons. The first was that there was no probable cause anywhere in there to suggest that either Mr. Massaro or his gun would be located at the Mendocino County house two weeks after the shooting. So you're saying this is an invalid warrant? Yes. And you're saying also that the police had no good faith reason to believe that it was a good warrant? I think that the – there's a couple of answers to that. The first is that Mr. Detective Brandon, who obtained that warrant, yes, knew that there was no probable cause that Massaro or the gun was there. In fact, if you read the warrant itself, you will find no – nothing to indicate that Massaro was there or that his gun was ever there. Again, this is two weeks after the crime, 200 miles away. In fact, it wasn't there. Mr. Ebert, do you concede that there was probable cause to believe that Mr. Barocca and Mr. Massaro were involved in murder and assault with intent to commit murder? I don't concede that Mr. Barocca – that there was probable cause to believe that Mr. Barocca was involved and responsible for that murder. However, it's irrelevant to this case because he was already in custody before that warrant was executed. And the warrant here was not the ring he wants. Well, I'm careful that there was probable cause to believe that he was involved in the murder. Whether or not he was in custody does not answer the question as to whether or not it would be reasonable to issue a search warrant for his residence to look for evidence related to the crime. As I understand your argument, you're challenging the nexus between the Guadalajara residence and the probable cause to believe that evidence would be there. Correct. My question is the first question, and I'm not sure you're giving up your case by conceding there's probable cause to arrest him for the murder. Well, again, it's my opinion and the arguments I've made in my brief that there was a probable cause to arrest Mr. Barocca. But once again, this is – Based on the testimony of eyewitnesses, including the victim – One. One. But it does – we're just talking probable cause here. And the victim says your client was the guy who said, fuck him, shoot him. Actually, it was one out of 14 witnesses. This was a man who was on parole. This was a man who was in violation of his parole. But we're talking probable – we're talking probable cause here. False – who gave a false name at the time, and the police officer knew that. But secondly, again, I want to get to your question about the nexus, which is the warrant here was not the Ramia warrant to arrest Mr. Barocca. The warrant here was to search for the gun at that house. There is nothing anywhere in that warrant that suggests that that gun can be or would be found in Mendocino County, a different county than the crime occurred, two weeks after the crime or that Mr. Mastaro was there. The warrant does establish that Mr. Barocca lived with Ms. Perez, does it not? It says that. Okay. There was conflicting evidence as to whether he was simply an occasional guest there. But the police – the police argument was that he was there. We're not trying the murder case here. Right. We're just trying to determine whether there's probable cause to believe that evidence related to the crime. And wouldn't it be relevant, as the Alameda County Superior Court judge considered, to know that Mr. Barocca was living with Ms. Perez and that the trash search of Ms. Perez's recently abandoned residence, which occurred shortly after the murder, revealed evidence of weapons, albeit not the same caliber, .38 caliber, but weapons nonetheless. Wouldn't that be relevant to the nexus determination as to whether Ms. Perez and Ms. Barocca might be in possession of evidence? If you're looking for a specific gun, which is not the gun that was involved in the trash search, if you're talking about something – a place that was 200 miles away and two who shared that apartment, by the way, with two other women and who the police were not contending that Mr. Barocca lived at that apartment, then no, I don't think it creates a nexus to Mr. Massaro's gun. But if Ms. Perez suddenly leaves town shortly after the homicide occurs and if the affidavit links Perez and Barocca as living together and Mendocino and Sonoma County officers discover them on the Mendocino coast, why would it be illogical for a police detective to conclude that they had fled to a rural part of northern California in order to hide from authorities in Hayward who were seeking them for the murders and the assaults? Well, I think whether or not it was logical to assume that those two individuals fled, it is not logical to assume, based on those facts, that Mr. Massaro was with them two weeks later at this other location, that he would take Mr. Massaro's gun with him and hide it at that house. I don't think that there's any – again, I don't think there's any nexus with the gun, Mr. Massaro's gun. I would also – But the officers – I'm sorry. Did the officers know that both Mr. Barocca and Mr. Massaro were ex-felons, known gang members, and had previously been arrested on weapons charges? Isn't that in the affidavit as well? I don't recall anything – I don't recall anything in the affidavit about gang membership. And maybe I missed that, but I don't recall that. Isn't that what the Alameda County deputy reported when the detective checked the – They reported that they were arrested on a weapons charge, which never resulted in a conviction. And as for being associates, I think – That's a probable cause here. Yes, I know. I think that Barocca is known to carry firearms in the past, and if the murder was committed with firearms, why wouldn't a reasonable police detective think that he might be in possession of firearms, including, but not limited to, the weapon used in the homicide? Well, I can see that I'm not making much headway on this point with Your Honor, but again, I make a distinction between – Well, I'm just looking at the facts here. I'm making a distinction. I think there's a big distinction between saying that the man uses firearms and that he would take another man's firearm with him two weeks later to a different place hundreds of miles away and keep that firearm with him. There's nothing in the affidavit to suggest that. Also, we know that there were what I would suggest are material misrepresentations and false statements in that warrant, one of which was – a very important one of which was that at the time the warrant was finally approved, the officer getting the warrant knew that Mr. Barocca was in custody and that the house had been secured and that Mr. Massaro was not there. Again, weakening the link between his gun and this location. The warrant is sought for the residence where he's now known to be living, and he was just arrested outside of it. So I don't understand why that is a material misrepresentation or omission. Either there's probable cause to believe that evidence relating to the crime is located in Mr. Massaro's home or not, and he's just been arrested outside of it. Mr. Barocca's – Well, that's what – A place Mr. Barocca had stayed with his girlfriend. And Julie Perez, who'd just been arrested only hours before by the Sonoma County deputy, told him that Massaro was there. So – No, she did not. You said there are two people, right? She's – no. She said there are two people there, Mr. Barocca and my cousin Jesse Perez. Right. And the officers who had conducted the surveillance for seven hours assumed that that was Jesse Perez, made all of their decisions based on it being Jesse Perez, who was wanted for nothing, as was Mr. De Alba, so it wouldn't have mattered if they'd gotten his name right or not. Okay. And, again, there – what's material about it is that the officer knew, yes, Mr. Barocca was there, but he was arrested. He was arrested, and that the house was secured and Mr. Massaro wasn't there. And he should have revealed that to the magistrate. But how does he know Massaro wasn't there just because he hasn't seen him? Actually, there's a declaration by the officer saying that he understood that he'd had contact with the officers who'd conducted the arrest of De Alba, that they'd had a firefight with a person that they believed was not Massaro. They certainly, all of the officers there who were communicating with him, knew that Massaro wasn't there. And, in fact, almost immediately after the shootout, Detective Miller – the guy with the tapes – tells his captain that Massaro, the man – the shooter, he says, the man with the Federal warrant, Massaro is not here. So it was known by the time that that warrant was sent to the judge for his signature that Massaro wasn't there. And to me, that really cuts, again, number one, I think it is a material omission in not updating the judge. There's case law in my brief suggesting that they have a duty. Maybe I'm missing your argument here. I still don't understand why there still isn't probable cause with regard to your client who's involved in the homicide to look for evidence related to the homicide that's in the home that your client is living or staying in. Number one, because I believe that the word of that one witness of 13, with all of his flaws, all of his problems, was not enough to involve Mr. Barocca in terms of probable cause for being a participant in that crime. But regardless of that, if the warrant had been for Mr. Barocca, which it wasn't, he was already arrested. The question is, why would he take Mr. Massaro's gun, carry it with him for two weeks to another county, and why would there be probable cause to leave with that gun would be present in his house when Mr. Massaro was not? It wouldn't be the first time in the annals of crime that one of two co-participants in a crime retained incriminating evidence tying both he and the other to the crime. I don't know that you and I are going to be able to resolve this. Let me ask you a different question, and that is the inevitable discovery doctrine, which the government raises in its brief. There was another warrant that was obtained, the Mendocino County warrant, in order to look for the meth lab, which there was probable cause to believe was inside. And if that's the case, then the incriminating evidence that tied your client to the charges that he was convicted of would have been inevitably discovered when that warrant was executed. No, Your Honor, and I disagree with that. Again, I think that it would not have been inevitably discovered. Because that Mendocino warrant was based on the look-see, on the evidence that they saw through the window. Well, that assumes the protective sweep was invalid. That's correct. And that was what I was going to spend my time on. Although it is discussed at great length in the brief, of course. But, yes, if the protective sweep is invalid, and I believe that it was. In fact, I think that's a very strong argument. Then the Mendocino warrant itself has to fall along with it, and I don't think the government disagrees with that. Now, why don't we hear from the government? Thank you. We wanted to see if, Tam, you've got six and a half. It's not too bad. Okay. Good morning, Your Honors. May it please the Court, my name is Mary Jean Chan, and I represent the United States Department of Justice. The defendant has raised several issues in his briefing, but the main issue that this Court has focused on so far has to do with the motion to suppress. And as Judge Fletcher and Judge Tolman have signaled, the Alameda County murder warrant independently justified the search at issue in the motion to suppress. First of all, I think it's important to recollect that it's completely independent from anything to do with the protective sweep. So it's setting aside any issues that this Court might have with the protective sweep, this is an independent warrant. And there is probable cause to support this warrant. First of all, the affidavit that Detective Brandon presented to the magistrate is very detailed. It's set forth at Excerpts of Record, Volume 1, 47 to 64. It's 18 pages long, single-spaced. It's very detailed. Yes, Your Honor. And most of it is throat clearing. It's a chronological detailing of the interviewing of all the witnesses at the charades bar where the murder was conducted on August 20, 1994. Numerous witnesses, and not only victim Latu, indicated that Mr. Barocca was involved. Very significantly, Mr. Villegas, who was a prior bouncer at A.J.'s bar and was involved, said that he stood six to seven feet behind Mr. Barocca when the shooting occurred. The shooting occurred with Mr. Barocca and Mr. Massaro both outside or in the hallway towards the back of the bar. So when counsel states that the gun and repeatedly states the gun belongs to Mr. Massaro, it's true that what witnesses saw was Mr. Massaro wielding the gun. There was no indication in the affidavit or from any of the witness statements that that gun belonged only to Massaro or that Barocca didn't have any claim to it at all. And, in fact, on page 60 of the warrant, I'm sorry, of the affidavit, it goes on to detailed investigation, and Detective Brandon talks about how through his investigation he finds out that Barocca and Massaro together have been known to be criminal accomplices, that they've been found in joint possession of a firearm. They were sitting during a search. They found that the two of them were sitting on a couch, and underneath them was a firearm. So there's clearly in that case, for example, joint possession of that firearm. So I think, first of all, it's a misconception to state that the gun purely is related to Mr. Massaro. And as Judge Tallman noted, Mr. Latu, who was a victim of the shooting, was shot at by Mr. Barocca, stated immediately after the shooting that Mr. Barocca had been the one who shouted the order for Mr. Massaro to shoot him. And very shortly thereafter that they had the suspects, including witness Perez, had basically disappeared from the area and were eventually located far away in a remote area in Mendocino. Yeah. I'm sorry to ask you to go back. You described something on the excerpt of Record 60, the numbered page of the affidavit leading up to the warrant, as them having been found together with jointly possessing a firearm. I'm not sure I understood precisely what you said. I can't reproduce exactly what you said, and I'm trying to track it based on what's in the affidavit. Of course. So I think it's in the third full paragraph. I'm in the paragraph, but I'm interested in what you said. Saying that this particular crime report documented them as having a history of carrying a loaded, concealed R firearm while in the company. No, I'm reading that, but what I'm interested in is, and maybe you can't fully reproduce what you said. It seemed to me that you said a little more than is actually in this paragraph. I was saying that that, I think, in the affidavit gives in rice an inference that they jointly possessed a firearm. But I'm interested in how you characterized the that, because I thought you said they jointly possessed. That's right. I said that I think that that paragraph gives rice an inference that they jointly possessed a firearm. In that instance. You see, I don't think, I don't read that. The particular crime report documents them being criminal associates. It also documents them having a history of carrying a loaded firearm while in the company of each other. That doesn't sound like jointly possessed. But, okay. I'll pass that. But it's, I think it's a point in your favor, but I'm not quite sure it's as strong as you stated. I'm looking at, I think it's excerpts of record 60. It's page 14. Yeah. There you go. Yes. The affidavit. It says on March 31, 1994, Bobby Barocca and Ronald Macero were both arrested for 12021.1 APC convicted felon in possession of a firearm. And your argument, Ms. Chen, is what? That they were both in possession? Right. That they had been found that there was a firearm and it wasn't clear whose it was. Oh, I see. It was. And so I'm saying that in light of that kind of a history, I think it's a little bit overreaching for counsel to state that it's very clear from the evidence stated forth in the affidavit that the gun belonged exclusively to Macero. And are you saying that in this arrest there was but a single firearm? I believe so. I believe so. And certainly, and I'm unable to find it at this precise moment. I won't pursue it further because I have to say that this is, I view this as a point in your favor. And I have to say, again, speaking only for myself, I think there's enough in this affidavit to support the warrant. Well, I appreciate that, Your Honor. And for the sake of the argument, why don't you assume that this judge also agrees and then move on to your next point? So, Your Honors, if you have no more concerns relating to the Alameda County murder warrant, I will move on. I know that Judge Shulman had mentioned the independent source doctrine and had talked about the Mendocino County warrant. Would Your Honors like me to address the protective suite? Well, counsel, since I think it's important, I'd like to hear your response. Sure. I believe that the chain of events the evening of September 2, 1994, gave rise to the valid protective suite. And I think this is set forth in the district court's 1995 order pretty clearly. I'm reading from Excerpts of Record, Volume 1, pages 17 through 18, where the court states that its finding is based on four undisputed facts. Now, its factual findings are reviewed by this Court under the clear error standard. First, D'Alba approached the officers with a loaded pistol in his pocket, then refused the officers' order to surrender. Two, D'Alba retreated toward the home, looked repeatedly into the home, then dove behind a retaining wall. Three, when officers approached D'Alba, his loaded pistol was out of his pocket. Four, he again refused orders to surrender, again looked toward the house, and could not be handcuffed until officers stunned him with mace. The district court also went on to make three other factual findings, which support the officers' concern about officer safety at the point of arrest. And this is on page 20 of the Excerpts of Record, Volume 1. One, that police believe that Massaro, a murder suspect, could have been in the house. Two, D'Alba carried a pistol. And three, D'Alba's retreat to the house could be interpreted as an attempt to warn other suspects. I think that these findings are undisputed. Certainly, the defendant did not at the time present any declarations, and I don't think really has presented any declarations, to counteract those facts. And again, speaking in terms of the chain of events that led to the protective sweep, the officers were waiting for the warrant. They had been patiently waiting for the warrant. And at the time that Mr. Barocca had been arrested, around 7.30, they had contacted Detective Brandon, according to Sergeant Miller's testimony at trial, and expected that the warrant would be coming in about 20 minutes. And where during this period was Detective Brandon? Detective Brandon was on the phone trying to get the warrant signed. And where was he located physically? I'm not absolutely sure. I think he was in Santa Rosa, because he had been talking to Ms. Perez. So he's not on scene at all? He's not on scene, and he had actually acted in a timely manner. He had received information about Barocca's presence at 6.40 on the phone, after having spoken with Mr. Officer O'Brien, who had actually seen Mr. Barocca. So even if the ---- I'm sorry to distract you from the protective sweep and come back to the warrant. No problem. But even if this is a bad warrant, in the sense that insufficiently supported by the affidavit by Brandon, if Brandon's not there on the scene executing the warrant, it sounds to me as though we've got a fairly good argument on your side that the officers executing the warrant had good faith belief that it was a valid warrant. Actually, Your Honor, I think that Detective Brandon came on scene to execute the warrant later on. I see. That was only at the time that they were applying for the warrant. Okay. That helps me. Thank you. Sure, Your Honor. So at the time Mr. Barocca was arrested, numerous officers saw Mr. D'Alba looking fidgety and nervous. Under this Court's precedent in Conkler, when there is an arrest and you can see or officers can see that somebody who is also potentially involved or has access to evidence and could destroy the evidence or pose a danger to officer safety is acting fidgety and nervous, that there are grounds under the exigent circumstances exception to the warrant requirement to go and secure the premises, to take away the potential troublemakers, I suppose you could say, and secure the premises until a warrant is brought over. That gave the officers a basis for going and trying to call Mr. D'Alba out from the premises. Before they were able to execute this plan, however, Mr. D'Alba came out. And then that gave the officers a second basis for stopping him, which was under the Terry stop, because officers had seen him carrying a firearm in his rear pocket. And this is not just one officer, but multiple officers. Officer Bushnell saw this. Officer Van Hagen. Also Sergeant Miller. When they tried to stop him, and they only tried to execute the Terry stop when he had actually left the premises, exited the gate, pushed open the gate, left the gate, tried to close the gate, he completely defied their orders to stop and instead walked backwards, retreated towards the house, looking repeatedly back towards the house, which is what the district court referred to in its order, and eventually made a very sudden movement by diving behind the berm, which was about ten feet away from the house. That was a position that clearly gave rise to the inference, I think very reasonably to the officers, that he was getting in a position to engage in a shootout or shoot at the officers. Do we have evidence that tells us that he dived behind the berm before any shooting took place? I think that all the officer testimony says that. He himself fired no shots. That is, I think the government's position is that he, what the officers found out later through forensic testing was that he had not been able to fire any shots. That's right. We know now he fired no shots. The only shots fired were by the officers. And what I'm asking you is, at the time he dives behind the berm, if that's the right way to characterize his action, do we know whether any shots had yet been fired? I mean, he says, I dived behind the berm to get away from the firing, but what other evidence do we have? I think that characterization is made by Mr. Barocca. I don't know that Mr. Dalva directly himself said that. Okay. The officer testimony at trial was that they saw him dive behind the berm, reach towards his right rear-hand pocket where the gun had been seized, and then shots rang out. So that the officer testimony is that he dove, then shots rang out. And ultimately... I'm going to say the officer testimony about this episode has a fair amount of inconsistency to it. In what respect, Your Honor? Well, for example, to have an officer who loads the chamber of the gun after picking up the gun from him, I mean, the officers are pitying this up substantially. Your Honor, I think there was confusion that evening. I think things happened very quickly, and what we... Do you think the adrenaline might have been flowing a little after that? My personal opinion, yes. How many shots were fired? Multiple. Did we ever determine? I think that the investigators did. I don't know offhand what was. I know that Sergeant Miller himself fired at least four rounds. Yes, but the other officers were armed with AR-15 assault rifles, right? That's right, Your Honor. So I think there was... Well, if someone wants to call them machine guns, they're semi-automatic, but you can fire a lot of rounds pretty quick. That's right. I think Judge Tom was right. There was a lot of lead and there was a lot of adrenaline. That's right, Your Honor. So the only extent to which I would contest the characterization that the testimony is inconsistent is that I don't not believe that the testimony was inconsistent in that the officers were lying. I think there was confusion because a lot of things happened very quickly. If you look at the investigation, which took place immediately after the shooting, the officers very forthrightly said that they had shot and what the situation had been, and Officer Dressler thought that he had initiated the shooting. He didn't try to pretty up the situation. He explained why he thought he had initiated the shooting, and this explanation was consistent throughout the course of the pretrial discovery as well as at trial. So there might have been some confusion, but I don't think there was any dissemblance. Yeah. You know, there's a little prettying up in one of these reports. I refer you to page 76 of the ER. Yes, Your Honor. At the very bottom of that, the last paragraph, this is a post hoc report. At one point, Sergeant Keeley put both suspects in the back seat of one patrol vehicle and activated a tape recorder. He must have been a tape recorder in the front seat. Prior to the suspects being transported to county jail, Sergeant Keeley retrieved the tape recorder from the patrol unit. I reviewed a portion of the tape recording and heard one of the suspects say, I drew down on them. Now, of course, he said something else. He said, I can pull it up here. He said, they're trying to prove that I drew down on them. Well, if he's just reviewed the tape recording and he leaves out the part of the phrase that says they're trying to prove that I drew down on them and reports only that he says I drew down on them, this is a police officer trying to pretty up the record. I would like to clarify that because I did actually cite to this portion in my brief. Yes, I know you did. And afterwards, when I received the reply brief, I checked and saw because I actually didn't have the tape. I was quoting from this citation. No, you cited directly to this precise fact. And I believe what actually happened was Agent Gray, the ATF agent, ultimately took the tape and listened to it. He believed that he couldn't hear anything from it, and he sent it for enhancement. After enhancement, he still couldn't really hear anything. So I'm not really sure who – well, the transcript was produced by the defense. And given that there was certainly some confusion about whether people could hear it or not, I think that to rely extensively on the transcript as proof positive of what the tape actually said may not be warranted here. Now, I do not agree. I also, therefore, agree that there may be some reason to doubt that Mr. Sergeant Kiley actually heard I drew down on them. But I think it may be that nobody really heard exactly what it was in both parties in that situation. He says he listened to the tape. Right. And then he says this is what he said. Now, so this – in the supplemental excerpts where I've got the tape recording and they say they're trying to prove I drew down on them, that was – when was that prepared? I'm not sure. I didn't – I did not have that material when I prepared my briefing. But I believe from looking at the supplemental excerpts that it was an exhibit to something. The tape was provided over to the defense immediately, early on in the discovery. So there's no discovery issue with respect to that tape. But I believe that the government's position was that it was inaudible. Okay. So you don't agree that that transcript is necessarily accurate? Correct. The tape itself, that's the evidence. And it had to be enhanced before you could hear more than I drew down on them? It had to be enhanced in order to hear anything. And from what the record shows, Agent Gray's conclusion was that you couldn't hear anything substantially even after the enhancement. So I do apologize for citing to this without having heard the tape myself. And you didn't have access to this transcript at that time? I – it's a very large case, and I went through all the records, but I did not come across this transcript or the tape. Whether you had access or not, you didn't see it. I didn't see it. I didn't see it. That doesn't excuse it that I didn't see it. With respect to the protective suite, after the entire incident which led up to the shooting, the shootout, I think at that point the officers clearly had a valid reason to believe, even though later on evidence showed that it had not been the case, that Mr. Dalla had shot at them or tried to shoot at them, and therefore there was a valid reason for the arrest, which then, which being so close under Hoyos gave rise, and given the fact that he kept looking backwards at the house as though perhaps there had been reinforcements, that gave them reason to conduct the protective suite, which was very limited in nature. It was, in my review of the record, no longer than seven minutes. Mr. Dalla was arrested at 7.50 at which time they commenced the suite. They transmitted to dispatch at 7.55 p.m. that the house portion had been secured. By 7.57 p.m., they indicated that they had found a lab that had not been secured, and at 7.59 p.m., a summary was transmitted to dispatch indicating that the suspects had been arrested, the house had been secured, Code 4. Your time is running, so I want to make sure you get a chance to address something we've not yet talked about. I think it won't take you more than a minute. And this is the question of the concurrent or consecutive sentence. Your Honor, I think that under this Court's case law, if there had been a real discrepancy in substance between the two sentences, this Court would have to remand so that the written judgment would conform with the oral judgment. But in this case, the record shows at PSR, paragraph 93, that Mr. Barova had been in custody continuously since 1994. So by the time of his sentencing in 2005, all the time had run out on his 120-month sentence on the gun charges. So when the district court sentenced him concurrently, the new sentences, the 240 months on the drug charges, to run concurrently to the prior sentence, to the extent there was any unexpired portion, there was no unexpired portion. So he was really just providing a synonymous sentence in his written judgment. I'm afraid that's how I read it. Before you sit down, I'd like to say one thing. You've written a very good brief, and you've made a very good argument, and you've sort of conceded where you ought to concede. And when I thought the guy, Brandon, wasn't there, you corrected me and said, no, he was there, which is contrary to your position. So I want you to understand what I'm about to say in the context of you having written a very good brief and given me a very straightforward argument revealing the weaknesses of your case. Nonetheless, would you look at page 8 in footnote 3 of your brief? Yes. And this is a small point, but it may be a point that is worth making. I'm sorry. Can you repeat that page? On page 8 of your brief, footnote 3. Yes. About six or seven lines down, you say the mention of, quote, methadone production. Now, on page 216 of the excerpt of record, we have that piece of paper. And it looks like either a to-do list or a shopping list. Do you have it with you? I have it in front of me, Your Honor. The second line of it says 1-0, and then there's a little space, 5, and then it says gallon. And then on the next line, it says all acetone. And then the next line, it says four sliding. The next says two tarps. Next line, maybe eight sawhorses. Next line, dustpan. For you to run those two lines of the to-do list or the shopping list together, so as to say 105-gallon all acetone, I do not think accurately characterizes what's on that list. Your Honor, I can understand your position. I believe that I was quoting accurately what was significant to the officers. Well, but they had that list, right? And I also cited to the record transcript. But I hate your point, Your Honor. But you're telling us that what was on that list was 105-gallon all acetone. Well, if that's what was on the list, that is dead-bang evidence of meth production. If instead it's a list of 10 5-gallon, maybe 10 5-gallon tubs, and then all acetone, that suggests but not as strongly. So the only reason I say that is that I think I'm just like the rest of my colleagues. I'm very sensitive to points that if it looks as though something's in there that's misleading, everything else goes tilt for me. Absolutely, Your Honor. And I want to close with what I began. This is a very competent brief, and your argument has been absolutely straightforward, and this is a very small thing. Thank you, Your Honor. Finally, I know that my time has run out, but the defendant asks for reversals on both convictions. Because he pleaded guilty to the second set of convictions, even if this Court is inclined to grant any relief, it can only grant relief on the first. But based on the arguments, we would ask that the Court to affirm. Thank you. Thank you. Thank you, Your Honors. First of all, in what little time is left to me, I'll try and be quick because I have a lot of points. First, on the question of probable cause for the Alameda County warrant, I would refer the Court to page 9 of my brief. There's an extremely long, over-foot-long, single-space note there, which I refer to multiple times throughout the brief. But I think that that will give you at least a partial list and a fairly long one of why I believe that the probable cause didn't exist for that warrant. As for the joint possession issue, what you see in that, in that brief is that the very brief mention is, number one, not anything about joint possession. You can't tell if there was one then. You can't tell if there was two. You can't tell who had it or anything from that section of the warrant. It would be that, that they were both armed. I mean, they're both charged with the felons in possession of a firearm. But, you know, what I'm saying is you can't really tell anything from that about what Mr. Barocca did. What we know is he was never convicted of that. But we do know that on that occasion he was arrested and charged with being a felon in possession of a firearm, which is a fact that the issuing magistrate can consider in trying to determine whether he's likely to be in possession of a murder weapon where he's now living. I think the question is whether that creates that rather weak inference creates a link between him and Mr. Massaro's weapon. We've got to look at it. We've got to look at it. We've got to look at it and see if we can find anything that suggests that.  We can't.   We can't say that.  We can't say that. We can't say that. We can't say that. Can't say that. And that's one fact. And nothing in there suggests that he ever possessed Mr. Massaro's weapon, that Mr. Massaro or his gun were ever at that house. No, no, it was Massaro's weapon. These two men were. These two men were. But that's the only evidence we have, that Mr. Massaro held it and used it. We know that Massaro was the shooter, and then your client allegedly, according to the witnesses, told Massaro to shoot one witness. Out of 14 who were there. But, again, it doesn't create a nexus between Mr. Massaro's gun and that house. It doesn't say that Mr. Massaro and Mr. Broca go everywhere, joined at the hip together. In fact, we know now that Mr. Massaro was in Wyoming at the time. That's where he was found. But I agree with the observation, I can't remember which of your honors made it, but this doesn't establish who had the gun. It doesn't establish that, you know, it doesn't establish anything in terms of actual possession or who possessed it. As to, and again, the idea of whether or not the gun actually belonged to Mr. Broca, even though there was nothing in the affidavit to suggest that, you know, is post hoc speculation. And I don't think that that's supported by the affidavit itself. As for the issue of the protective sweep, I would agree with Judge Fletcher that there was a lot, excuse me, of prettying up going on here. But I would suggest that there are even more important issues of prettying up than what the Court has focused on so far. And the most important ones were, number one, that De Alba fired at all. The person who made that assertion to his captain on the tapes moments after the incident was Sergeant Miller, the person who shot first. Sergeant Miller was not confused. He shot first. And yet moments later, he was saying to his captain, gee, he shot at me, so I shot back. He knew that that wasn't true. And I would suggest that he said that, you know, as a matter of self-protection, because it was an unjustified shooting. Counsel, one of the problems I have with the argument is that other than filing a declaration of counsel, you never put any of these facts in issue. And for that reason, the district court determined it didn't need to conduct an evidentiary hearing. So your case turns or falls entirely on the district court's reading of all of these reports and declarations by the deputies who were involved. And we would have to conclude that the district court clearly erred in finding that there was probable cause or actually reasonable justification for the protective sweep, would we not? Actually, Your Honor, just to be clear, first of all, we're contending that two different rulings of the district court were in error, one of which he had all of this evidence, and the other of which, you're right, he had the declaration of Mr. Osterhout. That declaration, however, does cite to actual evidence in the case, including evidence that the surveilling officers who were there for seven hours saw two and only two people there. And also — No, maybe I didn't make my question very clear. My question is, on review to the court of appeals, we are essentially — we would have to declare that the four key factual findings that were made by the district court to support the protective sweep are clearly erroneous. And we would have to do that, would we not, by looking at all of these police reports and declarations of the officers and, in essence, decide on our own whether or not there's inconsistencies and lack of credibility? Again, just to keep clear, the two separate ones. The one having to do with the 2002 motion for a new trial, no, because whether or not the court made a correct ruling as to the Brady violation as a grounds for a new trial is de novo. Okay. I'm just talking about the protective sweep. On the other one, yes. No, because you can also decide as a matter of law that many of these items, even if true, do not support the protective sweep. For example, I cited two cases, Sharar v. Felsing, which is a nice circuit case. The evidence is insufficient as a matter of law to permit the district court to make that factual determination? I'm giving you a precise example. For example, the court considered Mr. De Alva's having a gun and not submitting right away as factors, and that factor, for example, is contrary to Sharar v. Felsing and Colbert, two cases I cited, which say you can't consider the dangerousness of the arrestee in determining whether somebody else is in the house, because that's not the question. He may have been dangerous, or even if he was dangerous, that doesn't mean that somebody else is in the house. It doesn't mean that they had probable cause to believe that Mr. Massaro or anybody else was there, and if, in fact, that declaration, which is based on evidence that was before the court, says that they only saw two people in those seven hours, that they were told by Julia Perez that there were only two people there, then that would you would not be able to consider that. But they don't have to believe what Julia Perez tells them, do they? I mean, we have to look again. But they did. In order to determine the justification for the protective sweep, we have to look at all of the factors. They're conducting a murder investigation. They just arrested one of the murder suspects. They've seen this guy armed with a weapon. They've just had a firefight because he's resisted their efforts to arrest him. If there was somebody in the house, there's no doubt that they are well aware that the police are there at this point in the events, are they not? And then the question is, do they have the right in all of this context in order to protect themselves from an ambush from a third person who might be now hiding within the house? No. One, because... No, they don't have that right. No. Not under these circumstances. Again, if you go down the list that you say you're asking me do we have to find that he's clearly erroneous, I've just said one that's erroneous as a matter of law in that it cannot be considered the dangerousness of the R.S.D. Another one is the fact that Mr. ---- I mean, the Supreme Court tells us we've got to look at all of them. You can't divide and conquer like you're trying to convince us that we can. Well, if they're all, if they're all whatever's left after a matter of law insufficient, then I think that that is relevant. And for example, he considered the fact that Mr. D'Alba had a weapon. This Court in Gooch said the mere fact that you have a weapon is not a factor. And also, I think it was undisputed that Mr. D'Alba had been removed from the arrest scene. And again, that as a matter of law says you don't have to look at all this. No matter what happened before, if he's gone, the time for protection sleep under Shara, under Bui and Nushfar, this Court's case has expired. Thank you. Thank you both guys for a very useful evidence. The case of United States v. Barocca is now submitted for decision. We'll take a ten-minute break, and then we'll return. And we'll have one last case, and that's Davis v. Adamson.
judges: W. Fletcher, Tallman, Bertelsman